THE STATE v. ELKINS, *Appellant.*

1. Criminal Practice: COPY OF INDICTMENT, CLERICAL ERROR IN. It is not error for the trial court to refuse to defendant another copy of the indictment and time to consider the same because of error in the copy furnished which was merely clerical and which could not have misled or prejudiced him.

2. ———: COMPETENCY OF JUROR: OPINION. A juror who has no fixed or settled opinions and can try the issue without bias is not disqualified by an impression from rumor only, though it would require evidence to remove it.

3. ———: EVIDENCE: DYING DECLARATION. It is sufficient to render a declaration admissible as a dying one that it appears from the entire statement taken altogether that the declarant made it under a belief of impending dissolution, and after he had abandoned all hope of recovery.

4. ———: ———: ———. A statement so made *in extremis* that . the defendant "picked a fuss with me and was running over me, and because I did not want him to, he killed me," is inadmissible in evidence, because it gives merely the conclusions of the witness unaccompanied by the facts.

5. ———: ———: ———. Declarations of a deceased person are admissible only as to those things to which he could testify.

6. ———: ———: RES GESTÆ. Circumstances immediately surrounding a killing are admissible in evidence as part of the *res gestæ* and so are the remarks of bystanders, and especially is this so where the question is whether the defendant had reasonable cause to fear great bodily harm from the deceased.

7. ———: ———: ———. Where, however, a witness was fifty to one hundred yards away from the place where the fatal shot was fired, and immediately ran up to the parties, his remarks then made are not admissible as part of the *res gestæ.*

8. ———: ———: INTEREST OF WITNESS. It is competent for the defendant in a criminal trial for the purpose of affecting the credibility of a witness to show that he had indorsed notes to secure defendant's prosecution, and had made himself responsible for the fees of counsel assisting therein.

9. ———: ———: ———. The exclusion of such evidence does not, however, necessarily constitute reversible error.

The State v. Elkins.

10. ———: INSTRUCTIONS: OBJECTIONS TO. It is too late to object to instructions for the first time in the motion for a new trial.

11. ———: PROVOKING DIFFICULTY. It cannot be said there was no evidence tending to show that the defendant brought on or provoked the difficulty, where it appears he said of the deceased " By God, I will kill him or run him off."

*Appeal from Ripley Circuit Court.*—HON. JOHN G. WEAR, Judge.

REVERSED AND REMANDED.

*J. C. Sheppard* and *C. D. Yancey* for appellant.

(1) The court erred in overruling defendant's peremptory challenge of the juror J. N. Poynor. *State v. Bumsrill*, 37 Mo. 343; *State v. Wyatt*, 50 Mo. 309; *State v. Taylor*, 64 Mo. 358. (2) The testimony was not sufficient to support the verdict. (3) The court erred in not excluding statements of deceased to the witness Caughron. *State v. Simon*, 50 Mo. 370; *State v. McCannon*, 51 Mo. 160; *State v. Draper*, 65 Mo. 335; *State v. Rider*, 90 Mo. 55. (4) The court erred in refusing to permit witness Logan to state what was said by Whitwell when he rode up to defendant and deceased immediately after the shot was fired. *State v. Testerman*, 68 Mo. 408; *State v. Sanders*, 76 Mo. 35; *State v. Gabriel*, 88 Mo. 631. (5) The court erred in refusing to allow defendant to show the interest of witness Whitwell in the prosecution. (6) Instruction number 2 is erroneous because not based upon any testimony in the case going to show that defendant "voluntarily sought for, brought on or provoked the difficulty;" and because it is argumentative and states abstract propositions of law. *State v. Thompson*, 83 Mo. 257. (7) The court should have also informed the jury, by proper instructions, of what the different degrees of crime consist. *State v. Bryant*, 55 Mo. 75; *State v. Wyatt*,

50 Mo. 309. ( 8 ) The court erred in compelling defendant to proceed to trial without having him furnished with a true copy of the indictment.

*John M. Wood*, Attorney General, for the State.

( 1 ) The copy of the indictment was sufficient; the variation between it and the original was trivial and the objection is purely technical. ( 2 ). The juror J. N. Poynor testified " that his impression was based upon what he heard from rumor, and he was, therefore, competent. *State v. Bryant*, 93 Mo. 273. ( 3 ) The statements by deceased to Whitwell and Caughron were competent as dying declarations. *State v. Chambers*, 87 Mo. 406 ; *State v. Kilgore*, 70 Mo. 546 ; *State v. Draper*, 65 Mo. 335 ; *State v. Simon*, 50 Mo. 370 ; Wharton's Crim. Law, secs. 279, 282. Besides declarations to Whitwell were really a part of the *res gestœ.* *State v. Brown*, 64 Mo. 367. ( 4 ) It was not error to refuse to allow A. J. Whitwell to be cross-examined, as to whether he had indorsed notes or a note to secure the prosecution of defendant, or that he had made himself liable for the payment of fees to counsel, assisting the prosecuting attorney ; even if this was true, it does not follow that he was biased or prejudiced, and his testimony affected thereby. But if the evidence was competent as tending to affect the credibility of the witness, its exclusion was not such an error as demands a reversal of the case. It is only where an error is committed by a trial court to the prejudice of a defendant that this court will reverse. *State v. Cooper*, 83 Mo. 698 ; *State v. Griffith*, 67 Mo. 287 ; *State v. Robb*, 90 Mo. 30 ; *State v. Grate*, 68 Mo. 22 ; *State v. Holme*, 54 Mo. 160.

BLACK, J.—Joseph Elkins, the defendant, was convicted of murder in the second degree for killing Lemuel A. Morrison on the eighth of February, 1886 ; his punishment being fixed at ten years' imprisonment.

From the evidence it appears the defendant, the deceased, John Logan and David Tarleton were at a store in the afternoon of the eighth of February, 1886. Morrison, the deceased, left the store and went to the house of Mrs. Ann Elkins, which was about a half mile distant. The defendant, Logan and Tarleton followed him, all carrying shotguns. When leaving the store the defendant swore he would run the deceased off or kill him. On the way Logan and Tarleton shot off their guns, but for what purpose does not appear. They went into Mrs. Elkins' house, and while there defendant and deceased got into a controversy. The defendant picked up his gun and left the house and the deceased followed. When not more than twenty or thirty feet from the house, the defendant shot the deceased, the buckshot entered the breast, and some of them passed through the body. The deceased was going towards, and was close to, the defendant when the latter fired. The deceased fell to the ground, then jumped up and with assistance got on his horse and rode to Mr. Caughron's, where he died on the second day after the shooting.

According to the defendant's witnesses the controversy in the house arose over a twist of tobacco belonging to Morrison, which defendant put in his pocket and afterwards handed back, saying it was all in fun. Tarleton says: "They then pushed each other round a little; defendant put his hand in his pocket; Morrison put his hand in his pocket; defendant walked to the door and picked up his gun; neither said anything; Morrison grabbed the gun and said, 'Joe, you are no part of a man;' defendant said, 'Turn my gun loose, I want to go home;' defendant then called to John Logan and said, 'Let's go;' Logan and myself went out of the house after defendant went out; Morrison then came to the door; defendant told Morrison not to come out here; Morrison then went right out in a run toward

defendant; Morrison kept on running toward defendant; defendant told him to stop twice, then snapped, then told him to stop again; he did not stop, defendant then fired; Morrison was turning the end of fence when shot was fired, and was about five feet away; at the time the shot was fired Morrison's left hand was up; could not see his other hand; Morrison was drinking.''

1. According to the bill of exceptions, when the cause came on for trial the defendant made it appear that the word *leaden* in the copy of the indictment which had been furnished him was written *laden* in the indictment. Because of this error he demanded a true copy and also further time to consider the same, both of which requests were refused, and of these rulings error is assigned. The indictment when first describing how the gun was loaded speaks of ''leaden balls,'' and when describing the load discharged says: '' *laden* balls aforesaid,'' and in describing the wounding it again speaks of ''leaden balls aforesaid.'' The difference, therefore, between the indictment and the furnished copy is simply this, the copy in the three instances says leaden balls, and in one instance the indictment says *laden* balls aforesaid.

Where ordinary process is served by copy, if the defendant cannot be misled or prejudiced by a mistake in the copy, the service will be good. *Furnace Co. v. Shepherd*, 2 Hill ( N. Y.) 414. It is not contended that the use of the word *laden* vitiates the indictment. The copy states in correct language that which every one must know the indictment means. The defendant could not have been misled or prejudiced in the least by the clerical error in the copy, and this being so he had not just ground upon which to demand another copy or time to consider the same.

2. A juror upon his examination stated that he heard of the killing of Morrison by defendant a few days after the occurrence; that what he then heard left

an impression upon his mind, which impression he still retained ; that he made no inquiry to ascertain the facts in the cause; that he could hear the evidence without bias, but it would require evidence to remove the impression ; and that the impression was based upon what he heard from public rumor.  This juror knew nothing about the case, save from public rumor, and though he says it would require evidence to remove the impression made upon his mind, still he says he could hear the evidence without bias.  There is nothing in the examination as reported to show that he had any fixed or settled opinion about the case, and, under repeated rulings of this court, the challenge for cause was properly overruled.  *State v. Bryant*, 93 Mo. 273 ; *State v. Cunningham*, 100 Mo. 382.

3.  It is next objected that the court erred in the admission of evidence given by W. W. Caughron for the state.  It will be remembered that the deceased, when shot, got on his horse and rode up to Mr. Caughron's house.  Mr. Caughron met him at the gate.  The evidence of Mr. Caughron, to which the objection is made, is this:  "I met him and he said, 'I am killed ;' he told that he was killed at that low-down Sam Elkins'."  After cross-examination and on re-examination, the state asked the witness this question :  "What did Morrison state, if anything, in relation to Elkins' having provoked the difficulty?"  *A.*  "He said 'he picked up a fuss with me and was running over me, and, because I did not want him to, he killed me.  He called me a d——d son of a bitch.'"

The foregoing evidence was admitted on the ground of dying declarations, and an objection made is that no sufficient foundation had been laid.  The further evidence of Mr. Caughron is as follows :  "He lived from Monday evening until Wednesday morning; he asked me if I thought he could get well ; he asked me if I heard the wind as it came out of his breast; he said,

'I am killed;' he told us that he was killed, but not to take on, that he would have no taking on about it, and said, 'for God's sake, Wes., don't take it up;' said Joe Elkins shot him. I remained with him until his death; he was conscious up to Tuesday evening, after that time I am not certain. He said to Bob Whitwell: 'Joe, the little puke has shot me.'" The deceased also said to the person who assisted him in getting on his horse that he was killed.

In order to admit dying declarations, it should appear that the declarant made them under a belief of impending dissolution, and after he had abandoned all hope of recovery. *State v. McCannon*, 51 Mo. 160; *State v. Simon*, 50 Mo. 370; *State v. Draper*, 65 Mo. 335; *State v. Chambers*, 87 Mo. 408; *State v. Kilgore*, 70 Mo. 551. The inquiry made by deceased of Caughron, namely, "If I thought he would get well," taken by itself, would lead to the conclusion that he had not then given up all hope; but he stated repeatedly that he was killed, and told those present " not to take on." To Mr. Caughron he said, " for God's sake don't take it up." The deceased was mortally wounded, and, taking his statements as a whole, it is clear that he was conscious of that fact. It is impossible to escape the conclusion that he expected to die from the wound and that he had abandoned all hope, and, this being so, it follows that his statements were admissible on the ground of dying declarations.

The difficulty, however, arises over the answer of the witness to the question propounded by the state on re-examination. The deceased is here made to say: Defendant " picked a fuss with me, and was running over me, and, because I did not want him to, he killed me." This statement covers and includes all that transpired in the house and thereafter up to the time defendant shot. It is the only evidence introduced by the state as to what transpired in the house. It is not

a narration of the facts, and was not designed as such by the declarant, but it is a statement by the deceased of his conclusions as to the whole matter. The declarations of a deceased person are admissible only as to those things to which he could testify, if sworn in the cause, and he should state facts and not conclusions. Now, we are aware that such general conclusions often drop from a witness, and, when they are made by a witness on a witness stand so that there may be a full examination and cross-examination, they seldom furnish a ground for a reversal of a judgment. But here the witness, who is speaking, could not be examined or cross-examined, and his conclusions as to what transpired in the house are not accompanied with a statement of the facts. All of the facts covered by these conclusions of the deceased were susceptible of narration. The evidence elicited by the state on re-examination should have been excluded, that is to say, that part of it last quoted. It was for the jury, and not the witness, to draw conclusions.

4. The defendant asked the witness Logan what Whitwell said immediately after the shot was fired, and the court sustained the state's objection to the question. The question was asked on the theory that what Whitwell said was of the *res gestæ*. Whitwell was fifty to one hundred yards from the parties when the shot was fired, and then ran up to them. We have no intimation as to what he said. Circumstances immediately surrounding the killing are, of course, admissible, and so are the remarks of bystanders, and especially so where, as here, a question is whether defendant had reasonable cause to expect great bodily harm from the deceased. As Whitwell was not present at the time of the shooting, and as his remarks, whatever they were, were made subsequent thereto, we cannot say that they were of the *res gestæ*. The court did not err in sustaining the objection to the question.

5. It appears two witnesses were called by the defendant, namely, Robert Whitwell and Mrs. Ann Elkins, and testified in behalf of the defendant. The state thereafter called one A. J. Whitwell and proved by him that the two witnesses for the defendant bore a bad reputation for truth, and that Mrs. Elkins bore a bad reputation for chastity. The defendant then, and by way of cross-examination of A. J. Whitwell, proposed to show by him that he had indorsed notes to secure the prosecution of the defendant, and had made himself liable for the fees of counsel assisting in the prosecution, all of which evidence was excluded by the court. It was entirely competent to show that the witness was interested in the prosecution for the purpose of affecting his credibility, and the evidence should have been received. The bad reputation of the witnesses produced by the defendant, both for truth and one for chastity, was established by several other witnesses introduced by the state, and in view of this fact the error just mentioned should not produce a reversal, and especially so since there was no effort to sustain the two witnesses by showing that they bore a good reputation. The matter has been noticed here that the error may be avoided on a new trial.

6. No instructions were asked by the defendant; and no objections were made or exceptions saved to those given by the court at the time they were given. The first complaint of the instructions was made in the motion for new trial. It is too late to make objections to the instructions for the first time in the motion for a new trial, and they are not before us for review. *State v. McDonald,* 85 Mo. 539.

7. The defendant insists that there is no evidence showing, or tending to show, that he sought for, brought on or provoked the difficulty. To this proposition we do not agree. According to one witness, when he left the store, he said: "By God, I will run him off or kill

him." This evidence tends to show that the defendant went to the Elkins house for the very purpose of getting into trouble.

For the error before noted, which we regard as material, the judgment is reversed, and the cause remanded. BARCLAY, J., absent, the other judges concur.

|101  353|
|101  372|
|101  353|
|104   32|
|105  242|

|101  353|
|114  166|
|101  353|
|55a 282|

|101  353|
|62a 425|

|101  353|
|71a 131|

|101  353|
|75a 171|