State v. Craft.

---

THE STATE v. CRAFT, Appellant.

Division Two, November 12, 1901.

1. **Indictment:**NAME OF COURT IN WHICH FOUND: STATUTE OF JEOFAILS.
    An indictment which does not state upon its face the particular court in which found, is not fatally defective, because the statute provides that no indictment shall be deemed invalid and no judgment affected for want of proper or perfect venue, or for want of any venue at all, or for any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits, and the omission of such a statement in the indictment does not directly or remotely tend to the prejudice of the rights of the defendant.

State v. Craft.

2. ———: CAPTION. Where the record shows that the indictment was found in the circuit court of the proper county, it is not absolutely necessary to state the name of the court in the caption to the indictment.

3. **Continuance**: RECENT EMPLOYMENT OF ATTORNEY. Where defendant was indicted at one term of court, and the case set for trial at the next term, an application for a continuance at such term which simply states that his attorney had but recently been employed and had not had time to prepare his defense, states no ground whatever.

4. **Jury**: MOTION TO QUASH: EVIDENCE TO SUSTAIN CHARGES. A motion to quash the panel of jurors on the ground that forty-three of the fifty-five veniremen had been summoned from one township and not from the body of the county, can not be considered on appeal unless there was some evidence offered to support such recitals. They are not evidence of their own truthfulness.

5. **Juror**: QUALIFICATION: NEWSPAPER REPORTS. A juror who had read newspaper reports of the homicide, but who testified that in spite of that fact he could give the defendant a fair and impartial trial, was not disqualified to sit in judgment in the case.

6. **Handcuffing Prisoner.** The handcuffing or shackling of the prisoner in the presence of the jury should not be permitted unless there exists some good reason based on his conduct during the trial to justify it. But handcuffing him while in consultation with his counsel in the court room but not in the presence of the jury, but after the court has adjourned for the day, is no ground for reversal. Especially should this be the rule in this case where the trial judge, when his attention was called to the matter, ordered the handcuffs to be removed while the prisoner was in consultation with his counsel, which was done.

7. **Arrest of Escaped Convict**: NOTICE: SELF-DEFENSE. Where the law makes it a felony for one lawfully confined in prison to escape therefrom, the fugitive prisoner is not entitled to notice from one pursuing him that his purpose in pursuing him is to arrest him, nor is it necessary that he should be aware that such is his purpose. And where such escaping convict procured a gun to resist those pursuing him, and shot and killed one who had been commanded by the prison-guard to assist him in capturing the escaping fugitive, and who, in obedience thereto, was following him with a gun, he can not justify his act as being in self-defense.

State v. Craft.

8. **Provocation:** INSTRUCTION. Where the evidence does not justify an instruction for murder in the second degree, there is no ground for an instruction on "lawful provocation," and hence, to improperly define the words, or a failure to define them at all, is not error.

Appeal from Cole Circuit Court.—*Hon. Jas. E. Hazell,* Judge.

AFFIRMED.

*F. E. Luckett* and *Robt. W. Morrow* for appellant.

(1) ‵ The indictment in this case is bad, because the indictment does not show that it was found by a grand jury, "duly impaneled, charged and sworn" by a court competent to try the case, nor does it show that it was returned into the circuit court of Cole county, nor does it allege any venue or jurisdiction in the caption. (2) The court should have granted defendant a continuance. It was a reasonable request. Defendant was indicted at the March term and forced to trial at the following July term, in the face of the fact that his counsel had not sufficient time to prepare his defense. The charge was a serious one and counsel should have been given reasonable time to prepare his defense, especially in view of the fact that the interest of the State would not have suffered thereby. While it is true, that the granting of continuances rests largely in the discretion of the trial court, yet, where this discretion is abused by the trial court, this court will reverse and remand the cause. State v. Hillenschiet, 61 Mo. 302; State v. Whitlow, 68 Mo. 91; State v. Anderson, 96 Mo. 241. (3) The defendant had a right to a public trial by an impartial jury of the county. This constitutional right was denied him. Of the fifty-five jurors who were examined touching their qualifications to sit on the case, forty-eight resided in Jefferson township and Jefferson City, in the immediate neighborhood and

vicinity in which deceased was born and raised, and in which the tragedy occurred. Of the forty from which the trial jury was selected, twenty-nine resided in Jefferson township and Jefferson City. One of the jurors on his *voir dire* examina-·tion stated that he had formed an opinion; one other stated that he had talked about the case with his family physician, who was a witness for the State. Though defendant challenged these two jurors for cause, the court overruled his challenge. Thus was defendant forced to select the trial jury from a partial and prejudicial panel. Constitution, art. 2, sec. 22. (4) It was error to permit the guard to have defendant handcuffed in the courtroom during the preliminary stages of the trial and while in consultation with his counsel. The prisoner had a right, while on trial for his life, to be unfettered in the courtroom at any and all stages of the trial. State v. Kring, 64 Mo. 591. (5) The evidence must correspond and be responsive to the allegations in the indictment. The indictment did not charge that defendant was an escaped convict, and evidence that he was, was error and at variance with the indictment. 1 Greenleaf on Ev., secs. 50, 51, 52; Bank v. Murdock, 62 Mo. 70; State v. Jackson, 95 Mo. 649, and cases cited; State v. Worrell, 25 Mo. 205. (6) The record evidence that defendant had been convicted of robbery was wholly inadmissible. It is well settled that evidence of one crime can not be offered against a defendant on trial for a separate and distinct offense. This testimony was wholly incompetent and highly prejudicial to defendant. State v. Young, 119 Mo. 495; State v. Parker, 96 Mo. 382; State v. Martin, 74 Mo. 547; State v. Tabor, 95 Mo. 585; State v. Jackson, 95 Mo. 623; Wharton Crim. Ev., sec. 29, et seq. (7) The court should have instructed the jury on manslaughter. The defendant was entitled to this instruction upon his own testimony. A defendant has a right to have the question of his guilt or innocence passed upon by the jury on

the facts as testified to by himself.   State v. Brown, 104 Mo.
365; State v. Banks, 73 Mo. 592; State v. Postlow, 90 Mo.
608; State v. Palmer, 88 Mo. 568; State v. Young, 99 Mo.
666; State v. Croom, 85 Ga. 718; Com. v. Mockobee, 78 Ky.
380.   (8) The defendant testified that he shot the deceased in
necessary self-defense, and the court committed palpable error
in refusing to give an instruction on self-defense.   A defend-
ant in a criminal case is entitled to an instruction on self-de-
fense, although his testimony is the only evidence in support of
it.   State v. Fredericks, 136 Mo. 51; Munday v. Com., 81 Ky.
233.   It is a well-founded principle in criminal law that the
doctrine contended for by the defendant should be put in the
instructions to the jury.   State v. Holmes, 17 Mo. 381; State
v. Anderson, 86 Mo. 309; State v. Banks, 73 Mo. 592; State
v. Tate, 12 Mo. App. 327.   It is error to refuse a correct in-
struction as to the law relating to homicide in necessary self-
defense, where there is any evidence to support such defense.
State v. Sneed, 91 Mo. 552; State v. Rose, 12 Mo. App. 567;
Gibson v. State, 89 Ala. 121; People v. Adams, 85 Cal. 231;
Steinmeyer v. People, 95 Ill. 383; Hinch v. State, 25 Ga. 699;
McConnell v. State, 22 Tex. App. 354; Butler v. State, 33
Tex. Crim. Rep. 232; Baker v. People, 40 Mich. 411; Potter
v. State, 85 Tenn. 88.   (9) Instruction 7 assumes that the
defendant was aware and had notice that the object and inten-
tion of Henry Spieker was to arrest him, which is disputed by
the evidence, and was a matter for the consideration of the jury.
This instruction was extremely prejudicial to the defendant,
and states, in effect, that it is unnecessary for an officer or pri-
vate person in making an arrest, to notify the one arrested of his
purpose which is contrary to the statute and to all law upon the
subject of arrest.   Secs. 2540, 2541, R. S. 1899; State v.
Bryant, 65 N. C. 327; Brooks v. Com., 61 Pa. St. 352; Yates
v. The People, 32 N. Y. 509.   There must be an intention,

understood by the one arrested, to accomplish the arrest. 2 Am. and Eng. Ency. of Law (2 Ed.), p. 834; Jones v. Jones, 13 Ired. (N. C.) 448; Journey v. Sharpe, 4 Jones (N. C.) 165; Rex v. Ricketts, Campbell's Reps. 68. Every person has a right to resist an unlawful arrest or an arrest unlawfully violent and dangerous, both when he is arrested and after he is in custody. State v. Underwood, 75 Mo. 230; Seam v. State, 4 So. Rep. 521; Wright v. Com. (Ky.), 9 Cr. Law Mag. 331; Nobbs v. State, 26 Ala. 31; Dyson v. State, 14 Tex. App. 454; James v. State, 44 Tex. 314.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1) While it might have been well for the indictment to have stated on its face the particular court in which it was found, yet this is a matter of no great importance in view of the provisions of the statute of jeofails, section 2535, Revised Statutes 1899. State v. McDaniels, 94 Mo. 301; State v. Edmiston, 64 Mo. 398; State v. Henson, 81 Mo. 384. It will be observed that the record in this case shows the indictment to have been found in the circuit court of Cole county, and with the record so stating, no prejudicial error has been worked against the rights of the defendant. While it is well to do so, it is not essential to state the name of the court in the caption. State v. Daniels, 66 Mo. 193; State v. Blakely, 83 Mo. 359; State v. Freeman, 21 Mo. 482; State v. Kirk, 6 Mo. 496; State v. McDaniels, 8 Mo. 283. (2) At the time the indictment was found, defendant assured the court that he would employ his own counsel, and, therefore, did not ask, and there was no necessity for the court to appoint, counsel for him. One full term of court had elapsed, and while it might be true that Mr. Luckett had been employed in the case

State v. Craft.

but a short time, yet such is not sufficient to justify a contin-
uance when the defendant was given ample time to make such
employment; especially is such true when the affidavit dis-
closes no good and sufficient reason why such employment was
not obtained at an earlier date.    The application does not rest
upon grounds of absent witnesses, but relies simply upon the
fact that Mr. Luckett had been employed but a short time.
This fact, however, is denied, as is shown by the affidavits of
various persons.    The right to a continuance is a matter purely
discretionary with the court, and so long as the court does not
abuse this discretion, the appellate courts will not interfere.
It must clearly appear from the record that the discretion
lodged with the trial court has been abused to the prejudice of
the defendant before the appellate court will reverse the cause
upon that ground.    State v. Reimey, 137 Mo. 102; State v.
Banks, 118 Mo. 117; State v. Parker, 106 Mo. 217; State
v. Fox, 79 Mo. 108; State v. DeWitt, 152 Mo. 76; State v.
Webster, 152 Mo. 87.    There is no intendment in law favor-
ing an application for a continuance.    State v. Howell, 117
Mo. 307.    All intendments are taken against statements con-
tained in the application.    State v. Pagill, 92 Mo. 300.    (3)
An examination of the record will disclose that there is noth-
ing to show the truthfulness of the allegations contained in
the motion to quash the panel.    The averments in the motion
do not prove themselves, and as the matter was presented to
the court, even though it be conceded that the grounds therein
stated would justify appellant's contention, yet we must accord
the trial court full credit in performing its duty, and conclude
that, after a full and complete hearing upon the subject, it
found the facts therein alleged to be untrue.    In other words,
conceding defendant's motion and the averments therein made
to be true, there is no sufficient showing in the record to justify
the trial court in sustaining it; therefore, not sufficient reason

as shall justify this court in reversing the cause upon that point. (4) Simply because a juror has read newspaper articles concerning the commission of a crime, which connect the accused with the crime, will not disqualify him as a juryman. State v. Walton, 74 Mo. 270; State v. Brown, 71 Mo. 454; State v. Barton, 71 Mo. 288; State v. Elkins, 101 Mo. 344; State v. Brooks, 92 Mo. 542; State v. Cunningham, 100 Mo. 382. (5) The objection is made, however, by appellant, that after court had adjourned, and when the officer in charge of the defendant had been ordered to return the prisoner to jail, his counsel desired to confer with him, whereupon he was ordered to return him to the court room in order that his counsel might have an opportunity to so confer with him. It was during this conference that defendant's counsel noticed he was handcuffed and so reported to the judge. Whereupon the judge ordered that the handcuffs be removed. We can see no possible error in this. Defendant was not prejudiced because the occurrence did not transpire in court before the jury. (6) The defendant charges testimony to be wholly inadmissible, which related to the fact that the accused was a convict, and that it was introduced for no other purpose than to prejudice the minds of the jury against him. In this connection, we call the court's attention to the fact that it was absolutely necessary for the jury to know that the defendant was an escaped convict, as it was also necessary for the court to so know, in order that proper instructions upon the subject might be presented to the jury. No injury was inflicted upon defendant, as the jury were not asked to convict him because of his being a convict. (7) It is insisted that defendant was entitled to an instruction upon the question of manslaughter, based upon his own testimony, but an examination of the evidence will show that no such instruction was due the defendant. Looking at the crime committed from the most favorable stand-

point to the defendant, he was either guilty of murder in the first degree or the act was justifiable on the ground of self-defense. That being true, then every vestige of the crime of manslaughter disappears. State v. Tolbert, 71 Miss. 179; Com. v. Mockobee, 78 Ky. 380; State v. Croom, 85 Ga. 718; State v. Mowry, 37 Kan. 369; 2 McClain's Criminal Law, sec. 141; 11 Am. and Eng. Ency. of Law, p. 906. Self-defense does not apply to one who puts himself in a state of armed resistance and openly defies the processes of the State. State v. Garrett, 84 Am. Dec. 359.

BURGESS, J.—The defendant, an escaped convict from the State penitentiary, where he was undergoing a sentence for felony, was convicted in the circuit court of Cole county on the ninth day of December, 1900, of murder in the first degree, and his punishment fixed at death, for having shot and killed one Henry Spieker with a Winchester rifle. After unsuccessful motions for a new trial and in arrest defendant appeals.

On the morning of the ninth day of December, 1899, defendant escaped from the penitentiary; in descending the wall around the buildings he sustained an injury to his foot of such an extent as to render walking exceedingly painful and difficult. Finding a horse and buggy unattended near by, he got in the buggy and drove off. After reaching the outskirts of the city he abandoned the horse and buggy and continued on foot, and after walking a short distance, reached the home of John Heidker, which he entered, and going upstairs, he took possession of a repeating Winchester rifle, which had in its chamber from five to seven loaded shells. He told Mrs. Heidker that he wanted the gun to kill a chicken hawk. He then walked down the road, and had gone but a short distance, when he met William Schepker driving a horse

and buggy towards Jefferson City. He stopped Schepker and ordered him to turn the horse around and drive him towards home. Schepker protested, but finally consented. When he had driven about one mile, the defendant left the buggy and Schepker returned towards town. The point on the road at which defendant and Schepker parted was only a distance of a few yards from the driveway leading towards the residence of the Spieker family. Craft kept to the road, using the gun as a crutch to aid him in walking. After proceeding about a quarter of a mile, he came to the home of William Heimrich. He there went into the barn near the house to get a horse. He entered the barn, found the horse, led him out and proceeded to mount, when its owner, William Heimrich, came out and took hold of the horse's bridle and asked defendant what he intended doing with the animal. Some slight altercation ensued ending with defendant's deciding to give up the horse. Just at this moment another man came out of the house and spoke in German to Heimrich and immediately returned to the house. Defendant, as he states, fearing that the man's purpose in returning to the house was to procure a gun, was anxious to get away. He told Heimrich to let loose of the horse's bridle, and at the same time raised his gun as if to strike him. Being liberated, defendant rode out to the road; in order to continue his course, it was necessary that he pass by the Heimrich residence, and, fearing the man who had a few minutes previously gone into the house with the evident intention of procuring a gun, and in order to avoid any trouble, defendant turned the horse in the other direction and returned toward Jefferson City. Arriving at the driveway leading towards the Spieker homestead, he turned into it, hoping to reach and conceal himself in some timber which he saw further on.

William Heimrich, it seems, had been following him and shouted to the Spieker boys, who were shucking corn near the

house, to stop the man with the horse. The Spieker boys, Henry, Rudolph and Herman, ran into the house and provided themselves with guns, and pursuing the defendant, called upon him to give up the horse. Defendant turned the horse loose and walked to a creek near by, on the opposite side of which was some timber. He stopped by the creek and got a drink; he then disappeared in the timber after some wordy altercation with the Spieker boys. Heimrich came up and recovered his horse, and at this juncture Hermann Kolkmeyer, a prison guard, arrived upon the scene and informed the boys that the man they had been following was an escaped convict, and ordered them to assist in capturing him. He told them that the gun which the convict carried was not loaded and that there was a reward of twenty-five dollars for his capture. Kolkmeyer stationed Heimrich on the nearer side of the creek, to watch, while he, together with Henry and Rudolph Spieker, searched for the defendant on the other side. Hermann did not accompany them; leaving his gun with Heimrich, he returned home, taking the horse with him. Rudolph was about fifty feet beyond the deceased at the time the fatal shot was fired. He stated in his evidence that before he heard the shot he saw the deceased walking along by a worm fence some distance ahead, and immediately before he shot he heard the deceased say, "Throw up your hands; otherwise I will shoot." He saw smoke issue from a corner of the fence, but did not see the person who fired the shot.

Defendant then immediately shot deceased, from the effects of which he died on the following day. Defendant in his own behalf testified that at the time he shot deceased he was being pursued by him and others with guns, one of which was presented at him by deceased, and that he believed his life was in danger, and shot in self-defense and without any in-

Vol 164 mo—41

tention of killing deceased.

On the part of the State the court, over the objection and exception of defendant, instructed the jury as follows:

"1.    The court instructs the jury that if they find from the evidence, beyond a reasonable doubt, that the defendant, Joshua L. Craft, at Cole county, Missouri, on or about the ninth day of December, 1899, did feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, make an assault upon Henry Spieker with a certain rifle gun, and then and there with said rifle gun, feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, did kill the said Henry Spieker by shooting him upon the left hip and body, thereby inflicting upon him a mortal wound, of which, he, the said Henry Spieker, on the tenth day of December, 1899, died at said Cole county, Missouri, and that said Spieker was thus killed by the shooting aforesaid as charged in the indictment, then you will find the defendant guilty of murder in the first degree, and will so state in your verdict.

"2.    The court instructs the jury that, as used in the indictment and instructions, 'willfully' means intentionally, not accidentally.  'Feloniously' means wrongfully, and against the admonition of the law.  'Premeditatedly' means thought of beforehand, or that the act was thought of beforehand, for any length of time however short.   'Malice' means a wrongful act, done intentionally, without just cause or lawful excuse; it does not mean mere spite, hatred or ill-will, but signifies a disposition that shows a heart regardless of social duty and fatally bent on mischief; and 'malice aforethought' means that the act was done with malice and premeditation as here defined. 'Malice,' as here used, may be presumed from the intentional use of a deadly weapon, in a manner likely to produce death. 'Deliberately' means done in a cool state of the blood, not in a sudden passion, engendered by lawful or just cause of provocation.

"3.   The court further instructs the jury that if they believe from the evidence that defendant made any statements in relation to the homicide, after it is alleged to have been committed, the jury must consider such statements all together. The defendant is entitled to the benefit of what he said for himself, if true, and the State is entitled to the benefit of anything he said against himself; what the defendant said against himself, the law presumes to be true, because said against himself; the credit to be given to what the defendant said for himself is to be determined by the jury.   It is for the jury to consider, under all the circumstances, how much of the whole statement or statements of the defendant proved by the State, the jury, from the evidence in this cause, deem worthy of belief.

"4.   The court instructs the jury that they are the sole judges of the weight of evidence and the credibility of the witnesses; the degree of credit due to a witness you should determine by his character and conduct, his manner upon the witness stand, his relation to the controversy and the parties, his hopes and his fears, his bias and his impartiality, the reasonableness or otherwise of the statement he makes, the strength or weakness of his memory viewed in the light of all the other testimony, facts and circumstances in the case, and if you believe any witness has sworn falsely to any material facts you are at liberty to reject all or any portion of such witness's testimony.

"5.   The defendant is a competent witness in his own behalf, but the fact that he is the defendant, and as such, interested in the result of this case, may be considered by you in determining the credibility of his testimony.

"6.   The court instructs the jury that he who willfully, that is, intentionally, uses upon another, at some vital part, a deadly weapon, such as a loaded rifle gun, must, in the ab-

sence of qualifying facts, be presumed to know that the effect is likely to be death, and knowing this, must be presumed to intend death, which is the probable consequence of such an act, and if such deadly weapon is used, without lawful cause or provocation, he must be presumed to do it wickedly and from a bad heart. Therefore, if you find and believe from the evidence in this case, that the defendant took the life of Henry Speiker, by shooting him in a vital part, with a rifle gun, with a manifest design to use such weapon upon him, and with sufficient time to deliberate and to fully form the conscious purpose to kill, and without lawful provocation or excuse, then such killing is murder in the first degree. While it devolves upon the State to prove the willfulness, deliberation, premeditation, malice aforethought, all of which are necessary to constitute murder in the first degree, yet these need not be proved by direct evidence, but may be deduced from all the facts and circumstances attending the killing, and if you can satisfactorily and reasonably infer their existence, from all the evidence, you will be warranted in finding the defendant guilty of murder in the first degree.

"7. The court instructs the jury that if they find from the evidence that defendant was lawfully confined in the Missouri penitentiary as a prisoner on the ninth day of December, 1899, and, being so confined, did, on said day, escape from said penitentiary and that afterwards, on said day, at and in the county of Cole and State of Missouri, a guard from said penitentiary was sent in pursuit of defendant to arrest and return him to said penitentiary, and that on said day, at the county aforesaid, said guard informed Henry Spieker of the facts aforesaid, and called upon him to assist in effecting such arrest of defendant, and that being so called upon, said Spieker, on said day and at and in said county, attempted to arrest defendant to the end that he might be returned to said peniten-

tiary, and that defendant then and there to prevent such arrest, shot and wounded said Spieker, and that said Spieker at said county died of such wound before the finding of the indictment in this case, then there is no question of self-defense in this case.

"8.    The court instructs the jury that the defendant, in law, is presumed to be innocent, and that it devolves upon the State to prove, by evidence, to the satisfaction of the jury, beyond a reasonable doubt, that the defendant committed the crime, as charged in the indictment and explained in these instructions, and if, upon a view of the whole case, you have a reasonable doubt of defendant's guilt, you will give him the benefit thereof, and acquit him.    But a reasonable doubt, to authorize an acquittal on that ground, must be a substantial doubt of the defendant's guilt, formed on the careful consideration of all the facts and circumstances proven in the case, and not a mere possibility of the defendant's innocence.

"9.    If you believe from the evidence, beyond a reasonable doubt, that the defendant, at the time and place mentioned in the indictment, with a gun, willfully, premeditatedly, and of his malice aforethought, but without deliberation, shot and killed Henry Spieker, you will find him guilty of murder in the second degree, and assess his punishment in the penitentiary for a term of not less than ten years.

"10.    If the jury find the defendant guilty of murder either in the first or second degree their verdict must state specifically the degree of murder of which they may find him guilty."

The defendant, upon his part, prayed the court to instruct the jury as follows, to-wit:

"1.    The court instructs the jury that although you may believe and find from the evidence that on the ninth day of December, 1899, the defendant Craft was a convict in the Mis-

souri penitentiary, and that on said date he escaped therefrom and was at the time the fatal shot was fired an escaped convict, yet such fact would not authorize or clothe one not an officer of the law to pursue him with a deadly weapon, such as a gun, or to use any violence or threats upon his life in an attempt to arrest him, and if you find and believe from the evidence in the case that at the time defendant fired the shot he had no malice toward the deceased Spieker, but that he fired the shot in the heat of passion engendered by the continued pursuit and threats made by deceased, then you should find defendant guilty of manslaughter in the fourth degree, and assess his punishment at imprisonment in the penitentiary for two years; or by imprisonment in the county jail for not less than six months; or by a fine of not less than five hundred dollars; or by both a fine of not less than $100 and imprisonment in the county jail not less than three months.

"2. The court instructs the jury that the right to defend one's self against danger, not of his own seeking, is a right which the law not only concedes but guarantees to all men. The defendant may, therefore, have killed deceased and still be innocent of any offense against the law. If, at the time he shot deceased, he had reasonable cause to apprehend on the part of deceased, a design to do him some great personal injury and there was reasonable cause for him to apprehend immediate danger of such design being accomplished, and to avert such apprehended danger he shot, and at the time he did so, he had reasonable cause to believe and did believe it necessary for him to use his gun in the way he did to protect himself from such apprehended danger, then and in that case the shooting was not felonious, but was justifiable, and you ought to acquit him upon the ground of necessary self-defense."

Which said instructions numbered 1 and 2 the court refused to give the jury. To which refusal, the defendant, by coun-

sel, duly excepted at the time.

The first question presented by this appeal is with respect to the validity of the indictment which defendant insists is fatally defective because it does not show that it was found by a grand jury "duly impaneled, charged and sworn" by a court competent to try the case, and does not show that it was returned into the circuit court of Cole county, nor allege any venue of jurisdiction in the caption.

After stating the style of the case, the indictment proceeds as follows: "The grand jurors for the State of Missouri, summoned from the body of the inhabitants of the county of Cole in the State of Missouri, now here in court duly impaneled, sworn and charged, upon their oaths this day present," etc. While the indictment is somewhat inartistically drawn, it is not fatally defective because of the fact that it does not state upon its face the particular court in which it was found, for the very obvious reason, that section 2535, Revised Statutes 1899, provides that no indictment or information shall be deemed invalid, nor shall a trial, judgment or proceedings thereon be stayed, arrested or in any manner affected for want of a proper or perfect venue, nor for want of any venue at all, nor for the omission to allege that the grand jurors were impaneled, sworn and charged, nor for any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged; nor for want of the averment of any matter not necessary to be proved; nor for any error committed at the instance or in favor of the defendant; nor for any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits; and it can not be said that this defect did in any was directly or even remotely tend to the prejudice of the rights of defendant.

The record shows that the indictment was found in the

circuit court of Cole county, and this being the case it was not absolutely necessary to state the name of the court in the caption.

In the case of the State v. Kirk, 6 Mo. 469, it is said: "The only objection urged to this indictment is the omission to state in the caption in what court or at what term of the court, the bill was found. The records of the court show in what court and at what term this bill was found, and the caption to the indictment forms no part of the indictment. It does not give any information to the accused as to the nature of the charge, but is, in fact, a mere memorandum by the clerk or attorney, and becomes only useful when the record is taken to another court."

In case of State v. Freeman, 21 Mo. 483, the indictment, so far as the caption is concerned, is practically the same as the indictment in the case at bar. The same point was urged in that case. It was said: "But, in our practice, the caption is not always drawn up in form; but upon appeal, or in error, captions and all the entries in the record in relation to the matter are sent to this court, and these are accepted here in lieu of the formal captions that it was the duty of the clerk to have drawn up from them. The caption, of course, is no part of the indictment; but it must appear upon the face of the record, while the case is in the court, where the indictment was found, and from the transcript of the record, after its removal into this court upon appeal or writ of error, not only that the indictment is sufficient in form and substance, but also that it was properly preferred by a lawful grand jury in a court having jurisdiction over the matter; and if all this does not appear, it is error of which the defendant may take advantage. But if all this does appear, it is sufficient, although the commencement of the indictment be wholly omitted, and certainly all this does sufficiently appear upon this record, al-

though not as formally as it would have appeared had the record been drawn up in due form."

See also State v. McDonald, 8 Mo. 283; State v. Daniels, 66 Mo. 192; State v. Blakely, 83 Mo. 359.

It would seem from these authorities, that it is not indispensable for the caption of an indictment to set forth the name of the county or court or term of the court at which found, when these facts are shown by the record.

Defendant was indicted at the March term, 1900, of the circuit court, and the case set for trial at the July term next thereafter. At the last-named term he filed his application for a continuance on the ground that his attorney had but recently been employed and had not had time to prepare his defense, which was overruled, and in this he claims that error was committed. This application stated no ground whatever for a continuance and was properly overruled. It did not state what defense defendant had to make, or what evidence would be required to establish it, or where it was to be had. Nor did it state at what term nor how long it had been since the services of his attorney had been engaged. Besides, a motion for a continuance is addressed to the sound discretion of the court, and in the absence of an abuse of such discretion this court will not interfere. [State v. Fox, 79 Mo. 109; State v. Parker, 106 Mo. 217; State v. Banks, 118 Mo. 117; State v. Riney, 137 Mo. 102; State v. DeWitt, 152 Mo. 76; State v. Webster, 152 Mo. 87.]

Defendant presented a motion to quash the panel of jurymen, and as grounds therefor alleged that there are a number of municipal townships in Cole county, and that of the fifty-five jurors summoned by the sheriff as a special venire, forty-three of them were residents of Jefferson township, in which deceased resided at the time of his death, and were not, therefore, summoned from the body of the county. The motion

was overruled, and this, defendant claims, was prejudicial error. The answer to this contention is that no evidence was offered in support of the motion, and as the averments in the motion are no evidence themselves of their truthfulness, the judgment should not be reversed on the mere allegations in the motion.

The point is made that two of the jurors, Hampton and Barker, were challenged for cause, but that the challenges were overruled. The record shows that Hampton knew nothing of the case except what he had learned from another party, but remembered nothing that he said, and in fact had formed no opinion as to the guilt of defendant. It appears that Barker had read newspaper reports of the homicide, but said that he could give the defendant a fair and impartial trial. Under the repeated rulings of this court he was qualified to sit in judgment on the case, and there was no error committed in the ruling with respect to him. [State v. Brown, 71 Mo. 454; State v. Barton, 71 Mo. 288; State v. Walton, 74 Mo. 270; State v. Brooks, 92 Mo. 542; State v. Elkins, 101 Mo. 344; State v. Cunningham, 100 Mo. 382.]

The assertion is made that defendant was handcuffed in court during the preliminary stages of the trial and while in consultation with his counsel, which prejudiced the jury against him. But this contention is not sustained by the record, which shows that at and during the examination of the jury touching their qualification, after the adjournment of the court for the day, the guard having defendant in charge, put handcuffs upon him, and removed him from the courtroom, and that a few minutes afterwards, at the instance of defendant's counsel, he was taken into one of the rooms in the courthouse for consultation, and still had the handcuffs on, but on the judge's attention being called to the fact he ordered them removed. At no time other than as stated was defendant handcuffed

while the trial was pending.

At common law when a prisoner was brought into court for trial, upon his plea of not guilty to an indictment for a criminal offense, he was entitled to make his appearance free from all shackles or bonds (State v. Kring, 64 Mo. 591; State v. Kring, 1 Mo. App. 438; People v. Harrington, 42 Cal. 165); and, to justify shackles on the prisoner during the trial, there must exist some good reason, bottomed upon his conduct at the time of the trial; otherwise, in this country, when the prisoner is brought before the jury for trial the shackles should be removed. In the case at bar, however, the prisoner was not shackled in the presence of the jury during any part of the trial, and when request was made by his counsel to have them removed, during their consultation with him, the request was granted. There is, therefore, no cause for complaint by defendant on that ground.

As the indictment did not charge that defendant was an escaped convict, it is argued by defendant that evidence of that fact should not have been admitted, but this fact was a part of the State's case, which justified the pursuit of defendant for the purpose of capturing him and returning him to the penitentiary. There is no pretense that the effort to capture defendant was for any other purpose, or that he was justified in resisting arrest upon any other ground.

The homicide was, under the evidence, murder in the first degree, or justifiable upon the ground of self-defense. There was no manslaughter in the case, nor any evidence upon which to base such a conclusion. The defendant knew that he had escaped from the State's prison where he was lawfully confined, for a felony, and in order to enable him to more successfully resist arrest, and to make his escape he took from a dwelling-house, by force, a loaded Winchester rifle, and, as he stated on the witness stand, naturally looked back (a few

minutes before he shot deceased who was pursuing him for the purpose of arresting him) to see if he was being pursued and saw the deceased following in his tracks, that he commanded him to "Fall back, Fall back," but instead of doing so he presented his gun, when he, defendant, to save his own life, shot him. Defendant had every reason to believe that he was being pursued, in fact anticipated it, and had prepared himself with a loaded rifle to resist it, and to shoot down any person who might attempt it, and thus defy the law.

As was said in Tolbert v. State, 71 Miss. l. c. 189 : "The testimony conflicts as to which party shot first, and as to the precise order of the exciting occasion; but it distinctly appears that the Tolberts were both well armed, and that, when the dog barked, shooting commenced very soon. It is a just inference that the Tolberts were on the alert, and had their weapons ready for instant use. It is true no announcement was made to Tom by his would-be captors that they had come for him and wanted him, but it is reasonably certain that he had just grounds to believe that he was an object of pursuit that morning, and when he called to learn who was there, he was ready to open fire; and, whether he or Walter shot first, or the other parties did, is not material, for it is not to be tolerated that an escaped felon, arrayed against organized society, defying civil authority, with arms in his hands to resist arrest, and with an armed ally in the person of another, shall be treated with the consideration due to citizens generally. It may not be allowable for any one finding him to shoot him down on sight. He may not be, as Cain complained he was, liable to be slain by any one finding him, but, in his attitude, neither an officer nor a citizen arresting him was bound to take any risk of being shot. The very presence of Tolbert with arms and an armed attendant, was an overt act, apparently threatening toward any seeking to arrest him, justifying kill-

ing him on the slightest indication of the purpose to use his deadly weapon to prevent arrest. A citizen may bear arms for his defense against unwarranted attack. But an escaped penitentiary convict has not the right to bear arms for the unlawful purpose of defying civil authority and preventing arrest; and, as all have legal authority to arrest him, his demonstration of purpose to use a deadly weapon against captors, justifies his being killed."

There is no force in the objection that defendant was not notified nor aware of the purpose of the deceased in pursuing him. By section 2067, Revised Statutes 1899, it is made a felony for any person, lawfully confined in the penitentiary, to escape therefrom, and under such circumstances, notice of the purpose of the deceased to arrest defendant was unnecessary.

In State v. Mowry, 37 Kan. 1. c. 377, it is said: "Notice is only required to give the person an opportunity to desist from flight and unlawful action, and to peaceably surrender. If he necessarily knows the purpose of the pursuit and attempted arrest, no notice is needed. It is murder for a person to kill one whom he knows is pursuing him for a felony which he has just committed; and it has been said that 'where a party has been apprehended in the commission of a felony, or on fresh pursuit, notice of the crime is not necessary, because he must know the reason why he is apprehended.'" [Wharton's Crim. Law, 418.]

The sixth instruction given on the part of the State is criticised upon the ground that it does not properly define the term "lawful provocation" and the character of the "lawful provocation or excuse," which would mitigate the homicide, or render the homicide justifiable.

The answer to this contention is, that there was neither lawful provocation nor lawful excuse for the killing by defendant of deceased, hence it was unnecessary to define those words.

Under such circumstances no instruction should have been given for murder in the second degree and the failure to properly define the term "lawful provocation," or to improperly define it, was not reversible error.

Finding no reversible error in the record we affirm the judgment, and direct the sentence to be executed. All concur.